In the Matter of the Estate of CHARLOTTE F. STAFFORD, Deceased. NBT BANK, NA, as Executor of CHARLOTTE F. STAFFORD, Deceased, Respondent; RICHARD STAFFORD et al., Appellants. [975 NYS2d 810]—

Egan Jr., J. Appeal from an order of the Surrogate's Court of Chenango County (Ames, S.), entered May 29, 2012, which, among other things, granted petitioner's motion for summary judgment dismissing respondents' objections to decedent's will.

Charlotte F. Stafford (hereinafter decedent) died in 2010 and was survived by respondents—her three nephews—and their issue. Prior to her death, decedent had a keen interest in history and genealogy and served as the historian for the Town of Oxford in Chenango County. In 2001, decedent hired Vicky House to assist her with some typing; decedent and House became friends and, after decedent suffered a fall in 2004, House moved into decedent's home to care for her.

Over the years, decedent executed a number of wills—culminating in the August 2007 will that is the subject of this proceeding. Pursuant to the terms of that instrument, and in addition to various charitable bequests, decedent's property was to be distributed as follows: her ancestral home and all real property, together with $300,000 to maintain such property, was to be held in trust for the benefit of the Town and to be used for historical preservation purposes; her "historical books, records, memorabilia and genealogies" were to be given to House to be distributed between the Oxford Historical Society and the Oxford Town and/or Village Historian(s); and $100,000 was to be placed in a pet trust for the benefit of her cat, "Kissie Meouw Stafford." The pet trust would terminate upon Kissie's death—or 21 years following decedent's death—but, in the interim, House—in her capacity as Kissie's designated caretaker—was permitted to remain in decedent's residence rent-free. The remainder of decedent's estate was to be given to the Oxford Memorial Library, and decedent's will "intentionally ma[d]e no provision for [respondents]." A subsequent codicil to the will—the provisions of which are not at issue here—was executed in 2010.

Petitioner, as the executor of decedent's estate, offered the August 2007 will for probate, and a hearing pursuant to SCPA 1404 was held in October and November 2010. Respondents subsequently filed objections, contending that the will was the product of House's undue influence. In January 2012, petitioner moved for, among other things, summary judgment dismissing

the objections, and respondents cross-moved for partial summary judgment declaring that a confidential relationship existed between decedent and House. Surrogate's Court granted petitioner's motion for summary judgment, dismissed respondents' objections and allowed the will and codicil to proceed to probate. This appeal by respondents ensued.[1]

We affirm. Whether to dismiss a party's objections and admit the challenged will to probate is a matter committed to the sound discretion of Surrogate's Court and, absent an abuse of that discretion, the court's decision will not be disturbed (*see Matter of Shapiro*, 100 AD3d 1242, 1243 [2012]; *Matter of Colverd*, 52 AD3d 971, 972 [2008]). Although summary judgment in a contested probate matter indeed is rare, it nonetheless "is proper when the petitioner sufficiently establishes a prima facie case for probate and the respondent fails to raise any genuine issues of fact" with respect thereto (*Matter of Colverd*, 52 AD3d at 972). Upon reviewing the record before us, we discern no basis upon which to set aside the court's award of summary judgment to petitioner.

To establish undue influence, respondents were required to demonstrate that decedent "was actually constrained to act against [her] own free will and desire by identifying the motive, opportunity and acts allegedly constituting the influence, as well as when and where such acts occurred" (*id.* at 973 [internal quotation marks and citation omitted]; *see Matter of Alibrandi*, 104 AD3d 1175, 1177-1178 [2013]; *Matter of Greenwald*, 47 AD3d 1036, 1037 [2008]; *Matter of Castiglione*, 40 AD3d 1227, 1229 [2007], *lv denied* 9 NY3d 806 [2007]; *Matter of Fellows*, 16 AD3d 995, 996 [2005]). The influence asserted must rise to the level of "a moral coercion" (*Matter of Malone*, 46 AD3d 975, 977 [2007] [internal quotation marks and citations omitted]; *accord Matter of Favaloro*, 94 AD3d 989, 992 [2012]), and "[m]ere speculation and conclusory allegations, without specificity as to precisely where and when the influence was actually exerted, are insufficient to raise an issue of fact" (*Matter of Alibrandi*, 104 AD3d at 1178 [internal quotation marks and citation omitted]; *see Matter of Malone*, 46 AD3d at 977-978).[2]

Here, even assuming that respondents' proof was sufficient to

---

1. Although respondents' notice of appeal makes no mention of the corrected Surrogate's Court order entered in February 2013, "this technical defect does not inhibit our addressing the merits of this appeal in the interest of judicial economy" (*Matter of Edwards v Goord*, 26 AD3d 659, 659 n [2006], *lv denied* 7 NY3d 710 [2006] [internal quotation marks and citation omitted]; *see* CPLR 5520 [c]).

2. Notably, inasmuch as respondents failed in their attempt to demonstrate that a confidential relationship existed between House and decedent, no

establish that House had motive and opportunity to influence decedent's testamentary dispositions, respondents failed to demonstrate that House actually exercised undue influence with respect to the distribution of decedent's assets. By all accounts, decedent was a very intelligent, private and strong-willed woman who "ran her life the way she wanted to run it." Thomas Emerson, the attorney who drafted the August 2007 will (as well as decedent's January 2007 will, which made certain provisions for respondents), testified at the SCPA 1404 hearing that he had various discussions with decedent regarding the disposition of her estate beginning in November 2006. Despite his admitted concerns regarding House, Emerson did not observe any evidence of undue influence with respect to the execution of the various instruments[3] or the dispositions contained within (*see Matter of Alibrandi*, 104 AD3d at 1178; *Matter of Greenwald*, 47 AD3d at 1037).

With respect to the August 2007 will that disinherited respondents, Emerson testified that the changes made to decedent's January 2007 will were precipitated by her desire to preserve her home for historical purposes, as well as her belief that respondents "were directing or trying to direct her as to what she should do with her estate."[4] Emerson further testified that he reviewed and discussed the requested changes with decedent, in response to which decedent indicated, "That's what I want."[5] The paralegal who accompanied Emerson to decedent's home and witnessed the execution of the August 2007 will similarly indicated that decedent "was adamant about the changes she made." As for decedent's mental acuity and testamentary capacity on the day in question, Emerson testified that decedent was "very aware, alert . . . [and] knew what she wanted"—a sentiment echoed by the paralegal—and that he did not observe any behavior that caused him to question decedent's

"inference of undue influence [arose]" (*Matter of DelGatto*, 98 AD3d 975, 978 [2012] [internal quotation marks and citation omitted]).

3. According to Emerson, House was not present for the execution of the August 2007 will.

4. Emerson testified that decedent said of respondents, "Their heart[s are] in their pocketbook." Similarly, the paralegal who witnessed the execution of this will recalled that when decedent was questioned as to why she was changing her will, decedent replied, "[Respondents] just assume they are getting everything."

5. Although the changes reflected in decedent's August 2007 will indeed represented something of a departure from her prior testamentary scheme, such revisions were both explained and otherwise consistent with decedent's interest in historical preservation (*see Matter of Makitra*, 101 AD3d 1579, 1581 [2012] [the decedent explained the reasons behind the change in the contested will and "gave good reasons for doing so"]).

testamentary capacity (*see Matter of Greenwald*, 47 AD3d at 1037).[6] As Emerson succinctly put it, "[Decedent] had a mind of her own." Accordingly, despite his concerns regarding the changes to decedent's will and any resulting benefit to House, Emerson was "comfortable" that the August 2007 will was "what [decedent] wanted."

The foregoing proof, in our view, was more than sufficient to discharge petitioner's initial burden on the motion for summary judgment (*see Matter of Greenwald*, 47 AD3d at 1037). In opposition, respondents offered "no direct evidence that [House] did anything to actually influence decedent's distribution of her assets" (*Matter of Walker*, 80 AD3d 865, 868 [2011], *lv denied* 16 NY3d 711 [2011]). Moreover, even crediting respondents' claims that House made negative comments about them and curtailed their access to decedent, such circumstantial proof permits conflicting inferences, as a result of which "a conclusion of undue influence cannot be made" (*Matter of Malone*, 46 AD3d at 978; *see Matter of Turner*, 56 AD3d 863, 866 [2008]; *see also Matter of Minervini*, 297 AD2d 423, 424-425 [2002]). Accordingly, petitioner's motion for summary judgment dismissing respondents' objections was properly granted (*see Matter of Castiglione*, 40 AD3d at 1229). In light of this conclusion, we need not address the remaining arguments raised by respondents on appeal.

Peters, P.J., McCarthy and Spain, JJ., concur. Ordered that the order is affirmed, with costs.

---

**6.** Emerson's conclusions in this regard were consistent with the affidavit tendered by decedent's treating physician, who described decedent as "an assertive and strong-willed person who made her feelings and desires known" and who, during the time period in question, "was self-directing and able to make her own health care decisions" (*compare Matter of Nealon*, 57 AD3d 1325, 1327-1328 [2008] [the decedent evidenced increasing confusion and susceptibility to verbal suggestions]).